**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**CRISTI SABRINA PAULEY,**
       **Plaintiff,**

**v.**                                   **Case No.: 3:11-cv-00531**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

       **Defendant.**

**MEMORANDUM OPINION**

This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter the "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. (ECF No. 2). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 5 and 6). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12 and 18).

The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.   Procedural History

Plaintiff, Cristi Sabrina Pauley (hereinafter "Claimant), filed an application for SSI benefits on February 14, 2008, alleging a disability onset date of January 13, 2007

due to back pain, depression, migraine headaches, restless leg syndrome, and bipolar disorder. (Tr. at 135–38, 154–58, 168). The Social Security Administration (hereinafter "SSA") denied the application initially on April 11, 2008 and again on reconsideration. (Tr. at 64–68, 69–71). Thereafter, Claimant requested a hearing before an administrative law judge ("ALJ"). (Tr. at 75–77). The Honorable Andrew Chwalibog presided over Claimant's hearing on October 19, 2009. (Tr. at 22–49). Subsequent to the hearing, Claimant underwent a consultative examination and testified at a supplemental hearing on May 3, 2010. (Tr. at 50–61). In his written decision dated June 25, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 8–21). The ALJ's decision became the final decision of the Commissioner on June 13, 2011 when the Appeals Council denied Claimant's request for review. (Tr. at 1–5). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (ECF Nos. 9, 11, 12, 18). Consequently, the matter is ripe for resolution.

## II.   Relevant Evidence

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute or provide a clearer understanding of Claimant's medical background.

### A.   Treatment Records

#### 1.   *Prior to Disability Onset Date*

On June 27, 2006, Claimant was seen at Carl Johnson Medical Center and

reported that she had recently been admitted to the emergency room at St. Mary's Medical Center ("St. Mary's") for kidney stones. (Tr. at 411). The treating physician referred Claimant to Dr. Rajendra Jain. (*Id.*). On January 6, 2007, Claimant returned to the emergency room at St. Mary's with complaints of left flank pain radiating to her abdomen. (Tr. at 265–67). A CT scan of Claimant's abdomen and pelvic region was taken, which showed calcification within the lower pole of Claimant's left kidney with no abnormalities in Claimant's pelvic region. (Tr. at 263–64). Claimant was diagnosed with nonobstructive renal calculus. (Tr. at 266).

　　2.　　*Relevant Time Period*

　　Claimant returned to the emergency room at St. Mary's on February 1, 2007 with complaints of left flank pain radiating down into her lower quadrant. (Tr. at 260–61). Claimant reported a long history of kidney stones. CT scans of Claimant's abdomen and pelvic region were taken, showing that Claimant had a calculus on the lower pole of her left kidney but otherwise evidenced no abnormalities. (Tr. at 258–59). Claimant was diagnosed with renal colic. (Tr. at 260–61).

　　On February 13, 2007, Claimant presented to Carl Johnson Medical Center with complaints of carpal tunnel syndrome in both hands. (Tr. at 410). Claimant also reported that she was experiencing back pain and that her legs often felt very weak. (*Id.*). According to Claimant, she had trouble sleeping, experienced a tingling sensation in her legs intermittently, and both hands often fell asleep at night. (*Id.*). Mary Adams, CFNP, examined Claimant and detected no significant abnormalities. She noted that Claimant's coordination and strength were within normal limits. (*Id.*). Nurse Adams diagnosed Claimant with paresthesias in the right hand, restless leg syndrome, lower back pain, and migraine headaches. (*Id.*).  She recommended an EMG of Claimant's

right arm and legs and an x-ray of her lumbar spine. Nurse Adams also refilled Claimant's medication and instructed her to return in 3-4 weeks.

On March 1, 2007, Dr. Paul Akers reviewed x-rays of Claimant's lumbar spine. (Tr. at 225). Dr. Akers found that Claimant's vertebral body height and alignment were normal and did not evidence any sign of fracture or subluxation. (*Id.*). On March 12, 2007, Claimant presented to St. Mary's emergency room and was seen by Dr. Chadwick Smith. (Tr. at 253–54). Claimant reported intense left-sided back pain radiating down into her left flank. Dr. Smith concluded that Claimant's pain was likely the result of a lower back sprain or some other type of muscle sprain and found no evidence of kidney stone or kidney dysfunction. (*Id.*). CT scans of Claimant's abdomen and pelvic region revealed a calculus in the lower pole of Claimant's left kidney, but evidenced no signs of a urinary tract obstruction. (Tr. at 251–52).

On March 22, 2007, Claimant was seen by Dr. Glen Imlay at the Holzer Clinic with complaints of carpal tunnel syndrome. (Tr. at 226–29). Claimant reported that she had suffered from carpal tunnel beginning in the mid 1990s and that the symptoms had reoccurred in the past three to four months. (Tr. at 226). Claimant described waking at night with pain in her hands and also experiencing pain after driving or writing. (*Id.*). Dr. Imlay found that Claimant's strength, range of motion, and reflexes were within normal limits. (*Id.*). He observed that there was electrophysiological evidence of mild bilateral median nerve entrapment of the wrist involving sensory fibers only, but found no evidence of bilateral ulnar nerve entrapment around the elbow. (*Id.*). Later that day, Claimant was seen at Carl Johnson Medical Center with complaints of lower back pain, numbness in her legs, and general feelings of weakness. She was diagnosed with lower extremity weakness, back pain, and hand numbness.

4

(Tr. at 408). On April 30, 2007, Claimant was examined by Dr. Luis Bolano for her symptoms related to carpal tunnel syndrome. (Tr. at 278–79). Claimant reported waking at night with numbness and tingling in her fingers and a weakened grip.

On May 28, 2007, Claimant returned to St. Mary's emergency room after a violent altercation with her boyfriend. (Tr. at 233–35). According to Claimant, her ex-boyfriend struck her in the head with a stroller. (Tr. at 233). Claimant stated that she had not experienced any nausea, vomiting, or confusion but that her head ached. (*Id.*). CT scans of Claimant's sinuses and head revealed no abnormalities. (Tr. at 231–32). Claimant was diagnosed with a tension vascular migraine and a closed head injury. (Tr. at 235).

On July 27, 2007, Dr. Bolano performed a carpal tunnel release surgery on Claimant's right wrist. (Tr. at 281–82). By August 16, 2007, Dr. Bolano's examination of Claimant's right wrist revealed no abnormalities. (Tr. at 270–71). Dr. Bolano also noted that Claimant's gait, strength, reflexes, and mental status were all normal and she had no tenderness in her back. (*Id.*). In light of the success with the first surgery, Dr. Bolano performed carpal tunnel release surgery on Claimant's left wrist on August 21, 2007. (Tr. at 275, 280).

On October 9, 2007, a MRI of Claimant's lumbar spine was interpreted by Dr. Rodger Blake at Tri-State MRI. (Tr. at 384). Dr. Blake noted degenerative changes in the lower lumbar spine with a small central disc protrusion associated with an annular disc tear at L5-S1. (*Id.*). According to Dr. Blake, this produced mild right lateral recess stenosis, but no nerve root impingement was identified. (*Id.*). On December 6, 2007, Claimant returned to Holzer Clinic for a follow-up appointment with Dr. Imlay. (Tr. at 290). Dr. Imlay noted that Claimant's chief complaint was of back pain. She indicated

that anti-inflammatory medication had not helped relieve her pain. (*Id.*). At a follow-up appointment on January 9, 2008, Claimant reported that Etodolac helped with her back pain but that she occasionally needed to take two Lortab during the day if her pain was particularly bad. (Tr. at 291). Dr. Imlay diagnosed Claimant with lumbar strain, carpal tunnel syndrome, and lumbar neuritis with an annular tear at L5-S1. (*Id.*).

On January 13, 2008, Claimant returned to the emergency room at St. Mary's with complaints of a headache and chest tightness. (Tr. at 298–300). Claimant reported experiencing photophobia, phonophobia, nausea, and intermittent vomiting. (Tr. at 298). X-rays of Claimant's chest and head revealed no abnormalities. (Tr. at 301–03). The emergency room physician diagnosed Claimant with a migraine headache and costochondritis. (Tr. at 300).

On February 14, 2008, Claimant presented for psychotherapy with Kelly Daniel, MA, at University Psychiatric Associates. (Tr. at 307). Ms. Daniel documented that Claimant had been having difficulties with an ex-boyfriend, but they had recently talked and decided to try and "work things out." (*Id.*). On February 21, 2008, Claimant returned to University Psychiatric Associates for an evaluation by a psychiatrist, Dr. Samuel Januszkiewicz. (Tr. at 305–06). Claimant described her symptoms of depression and alcohol abuse. (*Id.*). According to Claimant, she had been feeling sad, with limited energy for the previous five months. (Tr. at 305). Claimant stated that she had trouble sleeping, was easily irritated, and was generally anxious. (*Id.*). Dr. Januszkiewicz noted that Claimant had a history of major depressive disorder and alcohol abuse. (*Id.*). She exhibited no psychomotor agitation but did appear nervous. (*Id.*). Her thought process was logical and well-directed without any delusional

6

content. (Tr. at 305). Dr. Januszkiewicz found that Claimant's insight and judgment were fair and diagnosed her with recurrent, moderate major depression, and alcohol abuse. Her Global Assessment of Functioning ("GAF") was 65.[1] (*Id.*). Dr. Januszkiewicz prescribed two antidepressants, Celexa and Trazadone, to alleviate Claimant's symptoms and help her sleep.

On March 13, 2008, pain medicine specialist, Dr. David Caraway, performed a physical examination of Claimant at St. Mary's Center for Pain Relief. (Tr. at 351–52, 371–79). Claimant complained of lower back pain radiating downwards, particularly when she was standing. (Tr. at 351). Claimant also complained of intermittent leg pain that generally occurred after long periods of standing. (*Id.*). Claimant did not experience any pain in her hips or below the knees. (Tr. at 373). She reported no history of trauma involving her back. (Tr. at 351). Claimant discussed her sleep patterns, stating that she slept five to six hours a night but awoke three to four times a night due to pain. (Tr. at 372). Describing her pain as "severe," Claimant rated it as an eight out of ten on the numeric pain scale. (Tr. at 373). Claimant informed Dr. Caraway that her back and leg pain had begun one year earlier and had worsened over time. (Tr. at 374). According to Claimant, sitting, standing, driving, lifting, and walking all increased her pain.

Dr. Caraway found that Claimant had a full range of motion of her cervical spine

---

[1] The GAF scale is a tool for rating a person's overall psychological functioning on a scale of 0-100. This rating tool is regularly used by mental health professionals and is recognized by the American Psychiatric Association in its *Diagnostic and Statistical Manual of Mental Disorders (DSM) IV-Text Revision.* A score of 61-70 indicates some mild symptoms OR some mild difficulty in social, occupational, or school functioning, "but generally functioning pretty well." On the GAF scale, a higher score indicates a less severe impairment.

and that Claimant could flex her lumbar spine to 80 degrees and extend to 30 degrees. (Tr. at 351). Claimant had good grip strength in her upper extremity. (*Id.*). Dr. Caraway discussed therapeutic options with Claimant with a particular focus on treating her pain symptoms from the annular tear at L5-S1. (*Id.*). Claimant and Dr. Caraway decided to proceed with epidural injection. (Tr. at 351). According to Dr. Caraway, Claimant demonstrated a calm manner, clear thought process, and was able to participate in the assessment process. (Tr. at 374). Dr. Caraway identified no cognitive barriers and found that Claimant was independent in her activities of daily living. (*Id.*).

On March 17, 2008, Claimant returned to Dr. Imlay's office for an appointment concerning her back pain. (Tr. at 319–20). Dr. Imlay found that Claimant's active health problems were mild bilateral carpal tunnel syndrome, lumbar neuritis, lumbar strain, and a neck sprain. (Tr. at 319). Claimant stated that she had begun a series of epidural injections with Dr. Caraway and that they helped to relieve her pain. (*Id.*). She reported that she was in stable condition. (*Id.*). Dr. Imlay found that Claimant retained full strength in her lower extremities and that her lumbar range of motion was stable. (*Id.*). On March 26, 2008, Claimant returned to University Psychiatric Associates for psychotherapy with Ms. Daniel. (Tr. at 461). Ms. Daniel and Claimant discussed her abusive boyfriend. (*Id.*). Claimant reported that she had only been drunk twice since her last appointment. (*Id.*). Claimant denied experiencing fatigue or memory problems. (*Id.*). On April 14, 2008, Claimant again attended psychotherapy with Ms. Daniel and they again discussed Claimant's abusive boyfriend and his negative effect on Claimant's mental health. (Tr. at 460).

On April 25, 2008, Claimant was given a lumbar epidural steroid injection at St. Mary's. (Tr. at 380–81). Claimant was diagnosed with lumbar radiculitis and an

annular tear of the L5-S1 disc. (*Id.*). Dr. Caraway examined Claimant a few days later to monitor the success of the injection. (Tr. at 368–69). Claimant's chief complaints were of lower back and left leg pain. (Tr. at 368). Dr. Caraway stated that Claimant had been given an epidural injection but that Claimant had called the following day with complaints of worsening pain and a headache. (*Id.*). Dr. Caraway described Claimant's MRI as "essentially normal" except for the possibility of an annular tear at the L5-S1 disk. (*Id.*). In addition, he found that Claimant's physical examination was "completely normal" with no neurological findings. (*Id.*). Dr. Caraway concluded that Claimant's physical health was "stable" and informed her that he had nothing else to offer her in terms of treatment. (*Id.*).

On May 2, 2008, Claimant attended psychotherapy with Ms. Daniel. (Tr. at 459). Claimant reported that she was back together with her boyfriend. (*Id.*). Claimant became very tearful discussing a recently deceased nephew, stating that she had experienced visual hallucinations of him. (*Id.*). Based on her reported symptoms and distress that day, Dr. Januszkiewicz recommended increasing Claimant's Celexa dosage. (*Id.*).

Two days later, a CT scan of Claimant's head was taken. (Tr. at 312). No abnormalities of the brain or calvarium were observed; the ventricles were normal in size and there was no evidence of a hemotoma or a hemorrhage. (*Id.*). Several days later on May 8, 2008, a MRI of Claimant's abdomen was taken at Tri-State MRI. (Tr. at 385–86). The results of the MRI were unremarkable with no masses or abnormalities. (Tr. at 385). On May 12, 2008, Claimant was examined by Dr. Imlay at Holzer Clinic. (Tr. at 389–90). Dr. Imlay reviewed Dr. Caraway's findings and discussed Claimant's continuing back and leg pain with her. (*Id.*). According to

9

Claimant, the epidural injections had given her a headache and her leg pain had increased since the last injection. (*Id.*). Dr. Imlay found that Claimant's lumbar range of motion and neck range of motion were both stable and that Claimant had full strength in her lower extremities. (*Id.*).

On May 13, 2008, Claimant returned to Carl Johnson Medical Center with complaints of a severe headache. (Tr. at 398). According to Claimant, her head felt like it was going to "pop off." (*Id.*). A CT scan of Claimant's head revealed no abnormalities and the reviewing physician found no sign of hydrocephalus or intercranial hemorrhaging. (Tr. at 311). Two days later on May 15, 2008, Claimant returned to Carl Johnson Medical Center with identical complaints of a persistent headache and vomiting. (Tr. at 397). Claimant was ultimately referred to a specialist for assessment and treatment of her chronic headaches. (Tr. at 396).

On June 12, 2008, Dr. Januszkiewicz met with Claimant to discuss the status of her mental health treatment. (Tr. at 458). Claimant reported that she had left her boyfriend and was feeling "much better." (*Id.*). According to Claimant, she worked three hours each morning caring for an Alzheimer's patient and also watched her grandson. (*Id.*). Dr. Januszkiewicz noted that her mood was good and that there had been no change in her health. (*Id.*). In conclusion, Dr. Januszkiewicz found that Claimant was "at a good baseline" at that time. (*Id.*). On June 19, 2008, Claimant attended a therapy session with Ms. Daniel. (Tr. at 457). Claimant reported that she had kicked her abusive boyfriend out of the house and that she was feeling happier and relieved that he was gone. (*Id.*). Claimant met with Ms. Daniel again on July 21, 2008. (Tr. at 456). Claimant reported that she had not gotten back together with her boyfriend. (*Id.*). Although she was drinking at least once or twice per weekend, she did

not think her intake was problematic. (*Id.*). Ms. Daniel observed that Claimant's mood was good and that her anxiety was low. (*Id.*). Claimant also stated that her pain level was much lower. (*Id.*). In light of Claimant's improved symptoms, Ms. Daniel found that Claimant's depression had "resolved," but Claimant continued to experience anxiety disorder, not otherwise specified ("NOS"). (*Id.*).

On August 21, 2008, Claimant met with Ms. Daniel for a regularly scheduled therapy appointment. (Tr. at 455). Claimant and Ms. Daniels discussed Claimant's new romantic relationship and her concerns over potential problems with the relationship. (*Id.*). Ms. Daniel diagnosed Claimant with anxiety disorder, NOS. (*Id.*). Claimant returned for a therapy appointment with Ms. Daniel on September 19, 2008. (Tr. at 454). Claimant reported that she had broken up with her new boyfriend and had been spending time with her ex-boyfriend. (*Id.*). Ms. Daniel and Claimant discussed the danger associated with that relationship. (*Id.*). Ms. Daniel affirmed her diagnosis of anxiety disorder, NOS. (*Id.*).

On December 18, 2008, Claimant met with Dr. Januszkiewicz and reported that she often felt irritable and tense. (Tr. at 452–53). According to Claimant, she continued to worry due to concerns related to her family, her job, and her living situation. (Tr. at 452). Nonetheless, Claimant stated that her situation had improved since her last visit. (*Id.*). She reported sleeping well while taking Restoril and that her energy level was "fair." (*Id.*). However, Claimant reported that she continued to have trouble concentrating on tasks and "following through" with activities, which she attributed to her anxiety. (*Id.*). Claimant denied any feelings of excessive guilt or loss of interest in activities. (*Id.*). Dr. Januszkiewicz indicated that Claimant was cooperative during the interview and her mood was generally euthymic. (Tr. at 452). Claimant's thought

11

process was logical, goal directed, and relevant. (*Id.*). Claimant denied any delusions, illusions, or hallucinations and reported no instances of mania. (*Id.*). Claimant also denied any suicidal or homicidal ideation. (*Id.*). Dr. Januszkiewicz observed that Claimant's symptoms had improved, but that she continued to experience significant anxiety. (*Id.*). Dr. Januszkiewicz recommended continuing psychotherapy to help build her self-esteem and feelings of independence. (*Id.*).

On April 23, 2009, Dr. Januszkiewicz evaluated Claimant at a follow-up appointment. (Tr. at 450–51). Dr. Januszkiewicz noted that Claimant returned to "reestablish therapy at her request." (Tr. at 450). In the months since her last appointment, Claimant's mood had deteriorated due to a number of stressors involving her family and her relationship with an abusive boyfriend. (*Id.*). Claimant reported that she had lost interest in activities that she had previously enjoyed and was having trouble sleeping, waking up one to four times on any given night. (*Id.*). Claimant informed Dr. Januszkiewicz that she had not been taking her sleeping medication for some time. (*Id.*). Claimant further reported decreased energy levels, an inability to concentrate, and an increased appetite. (*Id.*). Claimant denied experiencing any hallucinations or delusions. (*Id.*). Dr. Januszkiewicz noted that Claimant's mood was euthymic; she demonstrated logical and goal directed thought processes; and her judgment and insight were intact. (*Id.*). Claimant sat comfortably in the chair throughout the interview. (*Id.*). Based on his observations during their interview, Dr. Januszkiewicz diagnosed Claimant with depression with anxiety and anxiety disorder, NOS. (Tr. at 451). On May 18, 2009, Claimant attended therapy with Ms. Daniel. (Tr. at 449). During their session, Claimant and Ms. Daniel talked at length about Claimant's relationship problems. (*Id.*). Ms. Daniel diagnosed Claimant with anxiety

12

disorder, NOS. (*Id.*).

On July 23, 2009, Claimant attended an appointment with Dr. Januszkiewicz. (Tr. at 448). Claimant reported that she had been doing well over the previous four weeks and that she had experienced no periods of abnormally decreased or increased mood. (*Id.*). Claimant stated that she had a new boyfriend who had been treating her well. (*Id.*). According to Claimant, she continued to have difficulties sleeping. (*Id.*). Dr. Januszkiewicz documented that Claimant's mood was euthymic; her thought process was logical; and she demonstrated no signs of psychosis. (*Id.*). Claimant denied suicidal or homicidal ideations. (*Id.*). Dr. Januszkiewicz diagnosed Claimant with bipolar disorder and insomnia, NOS. (Tr. at 448).

Claimant returned for an appointment with Dr. Januszkiewicz on October 15, 2009. (Tr. at 446–47). According to Claimant, she had been feeling depressed for two months. (Tr. at 446). Claimant stated that she had purchased a house that needed repairs, but that she was unable to work on the house due to chronic back pain. (*Id.*). Claimant reported that she: was easily irritated, had no energy, was easily distracted, and felt guilty because she could not help her children. (*Id.*). Claimant also expressed alarm over having nightmares and flashbacks about her abusive ex-boyfriend. (*Id.*). According to Claimant she became very afraid when her children discussed her ex-boyfriend or when her ex-boyfriend visited her children. (*Id.*). Dr. Januszkiewicz noted that Claimant's active problems included anxiety disorder, NOS, and depression with anxiety. (*Id.*). Subsequently, Dr. Januszkiewicz diagnosed Claimant with major depressive disorder exacerbated by current stressors and Post-Traumatic Stress Disorder. (Tr. at 447).

Shortly thereafter, Dr. Januszkiewicz completed an evaluation of Claimant's

ability to do work-related activities on a day-to-day basis in a regular work setting. (Tr. at 443–45). First, Dr. Januszkiewicz evaluated Claimant's ability to make occupational adjustments, opining that Claimant's ability to follow work rules; relate to co-workers; deal with the public; use judgment; interact with supervisors; deal with work stresses; and maintain attention and concentration was poor.[2] Dr. Januszkiewicz also found that Claimant's ability to function independently was fair.[3] Second, Dr. Januszkiewicz evaluated Claimant's ability to make performance adjustments. (Tr. at 444). He found that Claimant's ability to understand, remember and carry out complex job instructions, and her ability to understand, remember, and carry out detailed, not complex job instructions were poor. (*Id.*). Her ability to understand, remember, and carry out simple job instructions was found to be fair. (*Id.*). Finally, Dr. Januszkiewicz evaluated Claimant's ability to make personal and social adjustments. (*Id.*). Dr. Januszkiewicz found that Claimant's ability to behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability was poor although her ability to maintain personal appearance was fair. (*Id.*). In conclusion, Dr. Januszkiewicz stated that Claimant's anxiety and mood problems limited her ability to attend and function in a work place setting. (Tr. at 445). Dr. Januszkiewicz found that Claimant was capable of managing any benefits that she was awarded. (*Id.*).

**B.    Agency Assessments**

**1.    *Physical Health Assessments***

On April 10, 2008, Fulvio Franyutti, MD, completed a physical residual

---

[2] A rating of "Poor" meant that the ability to function in this area was seriously limited but not precluded. (Tr. at 443).

[3] A rating of "Fair" meant that the ability to function in this area was limited but satisfactory. (*Id.*).

functional capacity assessment at the request of the SSA. (Tr. at 324–31). Dr. Franyutti found that Claimant could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in her ability to push or pull. (Tr. at 325). Claimant's postural limitation restricted her to activities that required only occasionally climbing ramps and stairs, balancing, stooping, kneeling, and crouching, and never required crawling or climbing ladders, ropes, or scaffolds. (Tr. at 326). Dr. Franyutti found that Claimant was not subject to any manipulative, visual, or communicative limitations. (Tr. at 327–28). Claimant's environmental limitations required her to avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards, such as machinery and heights. (Tr. at 328).

Dr. Franyutti subsequently reviewed Claimant's activities of daily living. (Tr. at 329). He noted that Claimant cared for her daughter; took her daughter to school; cleaned; prepared meals; watched television; performed personal care; drove; and walked to the laundromat. In her free time, Claimant visited with her boyfriend, daughter, and parents. (*Id.*). Claimant reported that she could not sit for prolonged periods of time, could only lift three to four pounds, and could only walk two blocks at a time. (*Id.*). According to Claimant, lifting, standing, and walking exacerbated her back pain. (*Id.*). Claimant's boyfriend also described Claimant's activities of daily living. (*Id.*). He stated that Claimant took her daughter to school but then would go back to bed until later afternoon. (*Id.*). According to Claimant's boyfriend, Claimant could perform personal care but struggled getting in and out of the bath tub. (Tr. at 329). He further stated that Claimant could drive, walk, and ride in a vehicle. (*Id.*). Claimant attended medical appointments, visited with family, and watched television regularly. (*Id.*). Claimant's boyfriend reported that she could lift six to ten pounds and

that prolonged sitting hurt her back. (*Id.*). Dr. Franyutti concluded that Claimant was partially credible in light of the objective medical evidence. (Tr. at 346).

On September 5, 2008, Marcel Lambrechts, MD, completed a second RFC assessment. (Tr. at 412–19). Claimant's primary diagnosis was lower back pain with a secondary diagnosis of chronic migraines. (Tr. at 412). Dr. Lambrechts found that Claimant could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in her ability to push or pull. (Tr. at 413). Claimant's postural limitation restricted her to activities that required only occasionally climbing ladders, ropes, or scaffolds; balancing; kneeling; crouching; and crawling. (Tr. at 414). Dr. Lambrechts found that Claimant was not subject to any manipulative, visual, or communicative limitations. (Tr. at 415–16). Claimant's environmental limitations required her to avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards, such as machinery and heights. (Tr. at 416).

Dr. Lambrechts noted that Claimant did not stop work due to a medical condition and had worked as a customer service associate from 2005 through 2007. (Tr. at 419). In Dr. Lambrechts' view, Claimant's complaints were exaggerated. (Tr. at 417). A recent MRI showed degenerative changes at the L5-S1 disc and disc dessication. (*Id.*). Although Claimant complained of lower back pain and severe headaches, Dr. Lambrechts observed that her physical exam was "not impressive." (*Id.*).

### 2. *Mental Health Assessments*

On August 27, 2007, Lisa Tate, MA, conducted a face-to-face psychological evaluation of Claimant at the request of the West Virginia Disability Determination

Service. (Tr. at 285–89). Claimant drove herself to the interview and demonstrated a normal gait with unimpaired use of her lower limbs. (Tr. at 285). Claimant reported that she was currently homeless and residing with friends and family. (*Id.*). According to Claimant, she suffered from bipolar disorder and unidentified "medical problems." (*Id.*). Claimant described her experience with bipolar disorder to Ms. Tate, explaining that she was diagnosed two years earlier. (Tr. at 286). Claimant stated that she had problems with concentration, comprehension, her memory, difficulty in getting along with others, and anxiety in social settings. (*Id.*). Ms. Tate discussed Claimant's mental treatment history with her. (*Id.*). Claimant reported that she had received outpatient treatment with University Psychiatric Associates for one to two years. (*Id.*).

Ms. Tate then completed a mental status examination, finding that Claimant's mood, affect, thought processes, thought content, perception, insight, judgment, immediate memory, remote memory, and psychomotor behavior were all within normal limits. (Tr. at 287). Based on the results of the examination, Ms. Tate assessed Claimant's recent memory as mildly deficient and Claimant's concentration as moderately deficient. (*Id.*). Ms. Tate diagnosed Claimant with a mood disorder, NOS. (Tr. at 288).

Claimant described a typical day to Ms. Tate. (*Id.*). According to Claimant, she generally woke up between two and three in the afternoon and went to bed between four and five in the morning. (*Id.*). Once she was awake, she would take a shower, prepare breakfast, and then go to her mother's house. (*Id.*). At her mother's house, she would typically watch television and assist her mother with any house cleaning. (*Id.*). During a normal week, she would visit friends several times and go to the grocery store once. (*Id.*). In conclusion, Ms. Tate found that Claimant's social functioning,

persistence, and pace were within normal limits. (*Id.*). Claimant's concentration was found to be moderately deficient. (Tr. at 289).

On April 10, 2008, Frank Roman, Ed.D, completed a Psychiatric Review Technique ("PRT") at the request of the SSA. (Tr. at 332–45). Dr. Roman found that Claimant's mental impairments were not severe although she exhibited some symptoms of depression, including feelings of guilt or worthlessness. (Tr. at 335). Next, Dr. Roman evaluated Claimant's functional limitations related to the paragraph B criteria. (Tr. at 342). Dr. Roman found that Claimant had mild limitations in her activities of daily living, social functioning, and concentration, persistence, and pace. (*Id.*). Further, Dr. Roman concluded that Claimant had not experienced any episodes of decompensation of extended duration. (*Id.*). Dr. Roman also found that the medical evidence did not establish the presence of the paragraph C criteria. (Tr. at 343). Dr. Roman reviewed Claimant's reported activities of daily living. (Tr. at 344). Claimant stated that she cared for her daughter, prepared meals, drove, handled finances, shopped, and visited with her friends and family. (*Id.*). According to her Adult Function Report, Claimant had difficulty staying on task and getting along with others. (*Id.*). Dr. Roman concluded that Claimant was credible based on the medical examination record. (*Id.*). He observed that Claimant was independent and that her limitations were mostly physical. (*Id.*). Based on her GAF score of 65, Dr. Roman found that she experienced "mild distress only" and that her mental impairments were nonsevere. (*Id.*).

On September 13, 2008, Debra Lilly, Ph.D, completed a PRT at the request of the SSA. (Tr. at 420–33). Dr. Lilly found that Claimant's affective disorder and substance addiction disorder were not severe impairments. (Tr. at 420). Dr. Lilly

evaluated Claimant's functional limitations related to the paragraph B criteria. (Tr. at 430). Dr. Lilly found that Claimant had mild limitations in her activities of daily living, social functioning, and concentration, persistence, and pace. (*Id.*). Further, Dr. Lilly concluded that Claimant had not experienced any episodes of decompensation of extended duration. (*Id.*). Dr. Lilly also found that the medical evidence did not establish the presence of the paragraph C criteria. (Tr. at 431). Dr. Lilly reviewed Claimant's reported activities of daily living. (Tr. at 432). Claimant stated that she cared for her daughter, prepared meals, drove, handled finances, shopped, and visited with her friends and family. (*Id.*). In conclusion, Dr. Lilly found that Claimant was only partially credible. (*Id.*). Although Claimant reported multiple problems, the medical record indicated that she complained of only physical problems and that there was no evidence of severe functional limitations. (*Id.*).

On February 1, 2010, Ms. Tate completed an updated psychological evaluation. (Tr. at 462–72). She recorded her general observations of Claimant, noting that Claimant walked with a normal gait, maintained normal posture, and appeared to have good use of all of her limbs. (Tr. at 463). Claimant's chief complaints were depression, bipolar disorder, and "medical problems." (*Id.*). Claimant reported that she had been diagnosed with bipolar disorder three to four years earlier and stated that her current medication was somewhat helpful. (*Id.*). According to Claimant, her bipolar disorder manifested in the form of frequent mood swings. (*Id.*). Claimant did not identify any further symptoms. (*Id.*). Claimant also described her experience with depression. (*Id.*). Claimant explained that she had experienced depression on an intermittent basis depending on the type of relationship she was in at the time. (Tr. at 463). At that time, Claimant stated that she was in a "bad" relationship and described experiencing daily

depression, which resulted in crying, social withdrawal, loss of interest in activities, irritability, difficulty sleeping, loss of energy, loss of appetite, nausea, headaches and elevated blood pressure. (*Id.*). Ms. Tate discussed Claimant's substance abuse problems and Claimant admitted to abusing alcohol from 2005 through 2008. (Tr. at 464).

Next, Claimant discussed her vocational history with Ms. Tate. (*Id.*). Claimant reported that she had been getting paid by her mother for the past year in exchange for her helping with housework and running errands. (*Id.*). According to Claimant, she had previously worked as a floor clerk at a discount store for 13 months prior to being fired in January 2007. (*Id.*). Claimant's other past jobs included work as a security guard, waitress, and childcare provider. (*Id.*).

Ms. Tate then conducted a mental status examination. (Tr. at 465). Ms. Tate observed that Claimant's mood was euthymic and that Claimant's thought processes were logical and coherent. (*Id.*). Claimant's thought content did not include any delusions or compulsive behaviors. (*Id.*). Claimant reported no unusual perceptual experiences. (*Id.*). Claimant's insight, immediate memory, recent memory, remote memory, concentration, and psychomotor behavior were all within normal limits. (*Id.*). Ms. Tate found that Claimant's judgment was mildly deficient. (*Id.*).

Based on her evaluation and interview with Claimant, Ms. Tate diagnosed Claimant with recurrent, moderate major depressive disorder. (Tr. at 467). Ms. Tate subsequently reviewed Claimant's activities of daily living. (*Id.*). Claimant reported going to her mother's house, watching television, washing dishes, sweeping, cooking, playing with her children, and going for walks. (*Id.*). According to Claimant, she did laundry and went to the grocery store on a weekly basis. (*Id.*). In conclusion, Ms. Tate

found that Claimant's social functioning, concentration, persistence, and pace were all within normal limits and that Claimant was capable of managing any benefits that she might receive. (*Id.*).

Ms. Tate then completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. at 469–72). Ms. Tate first evaluated Claimant's ability to understand, remember, and carry out instructions. (Tr. at 469). Based on her evaluation, Ms. Tate found that Claimant's mental impairments resulted in no limitation on Claimant's ability to: understand and remember simple instructions; carry out simple instruction; make judgments on simple work-related decisions; understand and remember complex instructions; and carry out complex instructions. (*Id.*). Ms. Tate found that Claimant was mildly limited in her ability to make judgments on complex work-related decisions. (*Id.*). Next, Ms. Tate evaluated Claimant's ability to interact appropriately with supervisors, co-workers, and the public, as well as her ability to respond to change in a routine work setting. (Tr. at 470). Ms. Tate found that Claimant was mildly limited in her ability to: interact appropriately with the public; interact appropriately with supervisors; and interact appropriately with co-workers. (*Id.*). Ms. Tate further concluded that Claimant was moderately limited in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*). Ms. Tate noted that no other capabilities were affected by Claimant's impairments. (*Id.*). In conclusion, Ms. Tate found that Claimant was capable of managing any benefits she might be awarded. (Tr. at 471).

## III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir.

1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. (the "'Listing") *Id.* § 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairment prevents the performance of past relevant work. *Id.* § 416.920(f). If the impairment does prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education,

and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868–69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). That section provides as follows:

 c) *Rating the degree of functional limitation.*

 (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

 (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about

the factors we consider when we rate the degree of your functional limitation.

3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment, the SSA determines the severity of the limitations. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1).

However, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's mental RFC. 20 C.F.R. § 416.920a(d)(3). The regulation further specifies how the findings and conclusion reached in applying the technique must be

24

documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusion based on the technique. The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(2).

In the present case, at the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since February 14, 2008, the date of the application for benefits. (Tr. at 13, Finding No. 1). Turning to the second step of the evaluation, the ALJ determined that Claimant's lumbar strain and depression were severe impairments. (*Id.*, Finding No. 2). Under the third inquiry, the ALJ compared Claimant's severe impairments to the Listing criteria and concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments. (Tr. at 14, Finding No. 3). Accordingly, the ALJ assessed Claimant's RFC, finding that Claimant had the residual functional capacity to perform light exertional work. (Tr. at 16, Finding No. 4). Claimant could never climb a ladder or scaffold; could not crawl; could only occasionally stoop, kneel, crouch, or climb a ramp or stairs; should avoid concentrated exposure to temperature extremes, vibrations, and hazards; was moderately limited in her ability to respond appropriately to usual work situations and to changes in a routine work setting; and was mildly limited in her ability to interact appropriately with the public, supervisors, and co-workers, and in her ability to make judgments on complex work-related decision. (*Id.*).

The ALJ then analyzed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 19–21, Finding Nos. 5–10). The ALJ considered that (1) Claimant was unable to perform past relevant work; (2) she was born in 1967, and at age 41 at the time of her application, was defined as a younger individual (20 CFR 404.1563); (3) she had a high school education and could communicate in English; and (4) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules framework supported a finding that Claimant was not disabled regardless of the transferability of job skills. (*Id.*). Based on the testimony of a vocational expert, the ALJ found that Claimant could make a successful adjustment to employment positions that existed in significant numbers in the national economy, such as a routing clerk, grader and sorter, assembler, and hand packer. (Tr. at 20). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 21, Finding No. 10).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant contends that the Commissioner's decision is not supported by substantial evidence because: (1) the ALJ failed to give proper weight to the opinion of Claimant's treating physician and (2) the ALJ failed to properly evaluate Claimant's credibility. (ECF No. 12 at 4). Claimant also submits additional medical records in support of her claim, arguing that the new evidence is relevant and material and supports a remand for consideration by the ALJ. (*Id.* at 5).

## V.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial

evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775. Applying this legal framework, a careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

**VI.   Analysis**

Having thoroughly considered the evidence and the arguments of counsel, the Court rejects Claimant's contentions and finds that the decision of the Commissioner is supported by substantial evidence.

### A.   Treating Source Opinion

Claimant argues that the ALJ failed to properly consider the opinion of Dr.

Januszkiewicz. (ECF No. 12 at 5–7). Specifically, Claimant contests the ALJ's decision to give "little weight" to Dr. Januszkiewicz's medical source statement of Claimant's ability to do work-related activities. In Claimant's view, the ALJ did not comply with the Social Security regulations in the manner in which he weighed Dr. Januszkiewicz's assessment, because the ALJ (1) failed to consider the factors set forth in 20 C.F.R. § 416.927(d) and (2) failed to provide an explanation of his reasons for discounting the weight of the opinion.

20 C.F.R. § 416.927(d) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, the SSA will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See* 20 C.F.R. § 416.927(d)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(d)(2). Nevertheless, a treating physician's opinion is afforded ***controlling*** weight only if two conditions are met: (1) the opinion is supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* A treating physician's opinion must be weighed against the record as a whole when determining a claimant's eligibility for benefits. *Id.*

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the factors listed in 20 C.F.R. § 416.927(d)(2)-(6). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5)

specialization, and (6) various other factors. "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight that will be given to it. 20 C.F.R. § 416.927(c(4). Ultimately, it is the responsibility of the Commissioner, not the court, to evaluate the case, make findings of fact, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). When a treating physician's opinion is not supported by clinical findings or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight, *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001), but must explain the reasons for discounting the opinion. 20 C.F.R. § 416.927.  The regulations do not state with specificity the extent to which the ALJ must explain the weight given to a treating source's opinion; however Social Security Ruling 96-2p provides that the ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." 1996 WL 374188 *5.

With this legal framework in mind, the Court has reviewed the ALJ's assessment of Dr. Januszkiewicz's opinion and concludes that the ALJ complied with the requirements of the applicable Social Security regulations and rulings. The ALJ explicitly discussed Dr. Januszkiewicz's Medical Assessment of Ability to do Work-Related Activities (Mental), noting that Dr. Januszkiewicz found Claimant to be seriously limited in many common daily work-related activities. Following his review of Dr. Januszkiewicz's function-by-function findings, the ALJ determined that Dr. Januszkiewicz's assessment was entitled to "little weight" because it was "inconsistent

with the evidence of record and [Claimant's] own reports of social functioning." (Tr. at 19). The ALJ then identified and discussed the other evidence in the record that was persuasively contrary to Dr. Januszkiewicz's opinion. (*Id.*). First, the ALJ reviewed Claimant's own reports of her social functioning. (*Id.*). Claimant reported that she went to her mother's house, visited with her children and grandchildren, and visited with her friends two to three times each week. (*Id.*). She further stated that she spent time with her boyfriend and occasionally went out to eat or to see a movie. (*Id.*). Moreover, Claimant reported working with her mother to care for others. She also attended physician appointments without difficult.

Next, the ALJ considered Claimant's treatment history with Dr. Januszkiewicz, pointing out that Claimant saw Dr. Januszkiewicz in June 2008 and then not again until December 2008. (Tr. at 19). Claimant discontinued therapy completely after December 2008 and did not return again until April 2009. (*Id.*). Following Claimant's return, she only saw Dr. Januszkiewicz twice in a three month interval. (*Id.*).

Finally, the ALJ compared and contrasted Dr. Januszkiewicz's RFC assessment with the opinions of the non-examining agency consultants and the results of Ms. Tate's mental health evaluations conducted in August 2007 and more recently in February 2010. (*Id.*). The ALJ noted that Dr. Roman and Dr. Lilly both opined that Claimant's mental impairments were not severe, opinions that profoundly conflicted with Dr. Januszkiewicz's opinion that Claimant's mental impairments significantly impeded her ability to perform basic work-related activities. (*Id.*). The ALJ also discussed Ms. Tate's opinion that Claimant had moderate deficiencies in her ability to adjust to changes in the work setting and mild deficiencies in some areas of social functioning and in her ability to make judgments on complex work-related decisions,

but otherwise functioned well. Considering the record as a whole, the ALJ concluded that Ms. Tate's opinion was more supportable and consistent with the evidence than the other more extreme opinions. Thus, he afforded Ms. Tate's opinion "great weight" in establishing Claimant's mental residual functional capacity. (*Id.*).

It is clear from the ALJ's written decision that he fully complied with the regulations when weighing the expert opinions. The ALJ considered the length of time Dr. Januszkiewicz's had treated Claimant, the frequency with which he examined her, the extent of his treatment, and the consistency and supportability of his opinions in light of the remaining evidence. (Tr. at 19). Because there was little to no evidence in the record that supported Dr. Januszkiewicz's extreme findings, the ALJ appropriately gave those findings little weight in his analysis. *See Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

Substantial evidence supports the ALJ's decision to afford Dr. Januszkiewicz's findings little weight. Over the course of a year and a half, beginning in February 2008, Claimant met with Dr. Januszkiewicz six times. (Tr. at 305–06, 446–47, 448, 450–51, 452–53, 458). Although Claimant's subjective complaints varied over that period of time, Dr. Januszkiewicz's objective findings were remarkably consistent. Dr. Januszkiewicz repeatedly found that Claimant was cooperative during her interviews and that her mood was generally euthymic. According to Dr. Januszkiewicz, Claimant's thought process was logical, goal directed, and relevant throughout this time period. Further, Dr. Januszkiewicz observed that Claimant's judgment and insight were fair despite her mental impairments. Claimant denied any delusions, illusions, or hallucinations and reported no instances of mania. Claimant also denied any suicidal or homicidal ideation. During the course of her treatment, in June 2008, Claimant

reported that she was feeling "much better." (Tr. at 458). According to Claimant, at that time, she worked three hours each morning caring for an Alzheimer's patient and watching the patient's grandson. (*Id.*). Dr. Januszkiewicz found that Claimant was "at a good baseline" at that time. (*Id.*). Throughout the relevant time period, Dr. Januszkiewicz's treatment regimen for Claimant was relatively conservative, consisting of anti-depressant medication and psychotherapy. On the sole occasion that Dr. Januszkiewicz assessed Claimant's GAF, he found it to be 65, indicating only mild limitations. In addition, Claimant's depression and anxiety were markedly situational, increasing acutely when she experienced a change or temporary crisis in her personal and familial relationships, then stabilizing when the triggering event passed. Even still, at no point did Dr. Januszkiewicz recommend that Claimant seek in-patient mental health treatment or residential care.

Moreover, Dr. Januszkiewicz's objective findings, as documented in his treatment notes, were consistent with the opinions of Ms. Daniel, Claimant's psychotherapist, and the three state agency experts. Over the course of a little more than a year, from February 2008 to May 2009, Claimant met with Ms. Daniel nine times for therapy sessions. (Tr. at 307, 449, 454, 455, 456, 457, 459, 460, 461). At nearly every session, Claimant discussed relationship issues and family problems that caused her to feel anxious and depressed. On July 21, 2008, after Claimant reported an improved mood and decrease in anxiety, Ms. Daniel found that Claimant's depression had "resolved." (Tr. at 456). At no point during her treatment with Claimant did Ms. Daniel recommend anything more than psychotherapy or anti-depressant medication. In addition, three state agency experts evaluated Claimant's mental health impairments. (Tr. at 285–89, 332–45, 420–33, 462–72). All three state experts agreed

that Claimant's mental impairments did not rise to the level of disability under the Listings. Two experts opined that Claimant's mental impairments were "non-severe;" in other words, that they constituted only a slight abnormality, or a combination of slight abnormalities, that had "no more than a minimal effect on the ability to do basic work activities." SSR 96-3p. Although Claimant exhibited some mild to moderate functional limitations, no state agency expert found that Claimant satisfied the paragraph B or paragraph C criteria. Further, no state agency expert found that Claimant's mental impairments prevented her from engaging in substantial gainful activity.

The weight given by the ALJ to Dr. Januszkiewicz's Medical Assessment of Ability to do Work-Related Activities (Mental) and the ALJ's explanation for discounting the weight are sufficiently clear for this Court to review their reasonableness. Consequently, the Court finds that, contrary to Claimant's assertion, the ALJ complied with his duties under the applicable regulations and rulings. In addition, the Court finds that the ALJ's determination to give little weight to Dr. Januszkiewicz's opinion is supported by substantial evidence.

### B.    Credibility Finding

Claimant also asserts that the ALJ failed to properly evaluate her credibility. She argues that her allegations and the medical records are mutually supportive. Accordingly, her statements regarding the persistence and severity of her pain and symptoms merited full credibility. Claimant contends that the truth of her statements regarding the disabling effects of her psychiatric symptoms was verified by Dr. Januszkiewicz's Medical Assessment of Ability to do Work-Related Activities (Mental). Further, she points to the MRI of her lumbar spine, which confirmed the presence of

an annular disc tear at the L5-S1, as well as her epidural injections and Lortab prescriptions, to substantiate the credibility of her statements regarding disabling back pain. According to Claimant, given that the objective medical record corroborated her claims, the ALJ erred when he found her credibility to be "poor."[4]

Social Security Ruling 96-7p explains the two-step process by which an ALJ must evaluate symptoms, including pain, in order to determine their limiting effects on a claimant. First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. SSR 96-7p. Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.*

Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by a claimant to support the alleged disabling effects. The ruling sets forth the factors that the ALJ should consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. In performing this evaluation, the ALJ must take into consideration "all the available evidence," including: the claimant's subjective complaints; claimant's

---

[4] To the extent that Claimant asks this Court to consider new evidence in evaluating Claimant's credibility, the Court is precluded from considering evidence that was never submitted to the Commissioner. *See Smith v. Chater*, 99 F.3d 635, 638 n. 5 (4th Cir. 1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963)); *see also Deane v. Commissioner of Soc. Sec. Admin.,* 428 Fed. Appx. 254 (4th Cir. 2011) (unpublished); *Bragg v. Astrue,* 2010 WL 3463994 (N.D.W.V. Sep. 3, 2010).

medical history, medical signs, and laboratory findings;[5] any objective medical evidence of pain[6] (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and other factors relating to functional limitations and restrictions.[7] *Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996).

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessment for that of the ALJ; rather, the Court must review the record as a whole and determine if it is sufficient to support the ALJ's conclusion. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence ... or substitute its own judgment for that of the Commissioner." *Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989–990 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va.1976)).

Having reviewed the Transcript of Proceedings, including the ALJ's written

---

[5] *See* 20 C.F.R. § 416.929(c)(1).

[6] *See* 20 C.F.R. § 416.929(c)(2).

[7] *See* 20 C.F.R. § 416.929(c)(3).

decision, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulations, case law, and Social Security rulings and is supported by substantial evidence. 20 C.F.R. § 416.929; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). The ALJ carefully considered Claimant's subjective complaints of pain *and* the objective medical record in reaching a conclusion regarding Claimant's credibility. Significant evidence existed in the record that Claimant's claims of disabling pain and other symptoms did not correlate with the objective medical evidence or with her own descriptions of her daily activities.

At the outset of the two-step process, the ALJ accepted that Claimant's medically determinable impairments could reasonably be expected to produce the pain and symptoms described by her. (Tr. at 17). However, the ALJ deemed Claimant to be less than fully credible in light of inconsistencies between her subjective complaints, the objective medical record, and her daily activities. (*Id.*). The ALJ reviewed Claimant's written statements and oral testimony concerning her mental and physical impairments and compared them to the objective medical evidence. (Tr. at 16–19). The ALJ discussed Claimant's treatment records at length. (*Id.*). Addressing Claimant's back pain, the ALJ emphasized that Claimant's physical examinations were essentially normal throughout her treatment course with stable range of motion, strength, and reflexes. An MRI of the lumbar spine did show the presence of degenerative changes and a small central to right paramedian disc protrusion associated with an annular disc tear, but there was no evidence of neural foraminal stenosis. (Tr. at 17). Moreover, Claimant experienced relief from pain medications and subsequently received lumbar injections. One month after receiving the injections, Claimant's follow-up physical examination was "completely normal," with no neurological findings. The treating

physician, Dr. Caraway, found Claimant's condition to be stable and indicated that he had nothing else to offer Claimant in the way of treatment. (*Id.*).

Turning to Claimant's mental impairments, the ALJ discussed Claimant's conservative treatment and the limited number of therapy sessions that she attended. (Tr. at 17–18). He reviewed Claimant's activities of daily living, stating that Claimant's own reports were inconsistent with disabling symptoms and limitations. (Tr. at 18). The ALJ noted that Claimant worked three hours each morning caring for an Alzheimer's patient and also watched her grandson. She helped her mother care for others, cleaned her mother's house, did dishes, ran errands, cooked, played with her grandson, swept, did laundry, and went shopping. In addition, the ALJ considered Claimant's lack of crisis intervention and in-patient psychiatric treatment. (*Id.*). Finally, the ALJ took into account the findings of the consulting mental health experts. (Tr. at 18–19). The ALJ found that their evaluations were deserving of great weight because they were consistent with the objective medical findings. (Tr. at 18). The ALJ stressed that other than Dr. Januszkiewicz, that no mental health expert found Claimant to have severe functional limitations as a consequence of her mental impairments. (Tr. at 19). Based on this evidence, the ALJ concluded that Claimant's credibility was poor. (Tr. at 18).

Substantial evidence supports the ALJ's credibility determination. Claimant's testimony was "inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain that the claimant alleges [she] suffers." *Hines*, 453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Despite Claimant's contention that she was unable to work, no consulting expert found her unable to perform basic work-related

activities. Furthermore, some of the consultants found Claimant to be only partially credible because the medical evidence simply did not substantiate the degree of severity, persistence, and intensity alleged by her. An ALJ is entitled to afford significant weight to the opinion of a state agency psychologist or physician: agency regulations specifically provide that state agency medical consultants "are highly qualified physicians ... who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i). Consequently, the ALJ reasonably found Claimant's credibility to be limited to the extent that Claimant's testimony was contradicted by other persuasive evidence in the record and her daily activities. *Hines*, 453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Therefore, the undersigned finds that the ALJ's analysis of Claimant's credibility was sufficient and his conclusion was supported by substantial evidence.

### C.   New Evidence

Finally, Claimant argues that new evidence warrants a remand of the Commissioner's decision. (ECF No. 12 at 9). According to Claimant, she was hospitalized for psychiatric treatment on two separate occasions in 2011 and records from these admissions should be considered by the Commissioner in ruling on Claimant's application for benefits. Claimant contends that the new evidence supports her claim of disability based upon bipolar disorder, anxiety disorder, nightmare disorder, borderline personality disorder, and migraine headaches. In response, the Commissioner asserts that Claimant's evidence does not warrant a remand because it does not relate to the period on or before the date of the ALJ's decision. (ECF No. 18 at 17). The Commissioner argues that Claimant should file a new application for benefits rather than seeking to overturn the ALJ's opinion in the instant case.

Title 42 U.S.C. § 405(g) provides that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." The claimant may submit new evidence at any stage of the administrative procedure. *See* 20 C.F.R. §416.1470(b). New evidence submitted once the case is filed for district court review will only trigger a remand if it meets the criteria set out in *Miller v. Barnhart*, 64 Fed. App'x 858, 859 (4th Cir. 2003). In *Miller,* the Fourth Circuit Court of Appeals held that new evidence merits a remand if: (1) the evidence is relevant to the determination of disability at the time the application(s) was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant makes at least a general showing of the nature of the new evidence to the reviewing court. *See Miller*, 64 Fed. App'x at 859 (citing *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985)) ; 42 U.S.C. 405(g)); *Wilkins v. Sec'y, Dep't of Health and Human Servs.*, 953 F.2d 93, 96 n.3 (4th Cir. 1991).[8] For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was not in existence or available to the claimant at the time of the administrative proceeding and is not

---

[8] The criteria set forth in *Miller* comes from *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985). Although *Borders* was superseded by statute, 42 U.S.C. § 405(g), as recognized in *Wilkins v. Sec'y, Dept. of Health and Human Servs.,* 925 F.2d 769, 774 (4th Cir. 1991), and *Wilkins* itself was subsequently vacated, courts in the Fourth Circuit have continued to rely on the *Borders* four-part test. *Wood v. Astrue,* 2011 WL 1002874, at *4 n.3 (D.S.C. Feb. 23, 2011) ("the Fourth Circuit has continued to cite *Borders* as the authority on the requirements for new evidence when presented with a claim for remand based on new evidence, and the U.S. Supreme Court has not suggested that the *Borders* construction of § 405(g) is incorrect."); *see also Smith v. Astrue*, 2011 WL 5117571, at *4 n.3 (W.D.Va. Oct. 26, 2011).

"duplicative or cumulative." *Wilkins*, 953 F.2d at 96. Such evidence is "material" only if there is a reasonable possibility that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence. *Bradley v. Barnhart*, 463 F.Supp.2d 577, 579 (S.D.W.V. 2006) (citing *Bruton v. Massanari,* 268 F3d. 824 (9th Cir. 2001)). A claimant shows "good cause" by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the administrative proceedings before the Commissioner. The burden of showing that a remand is appropriate is on the claimant. *See Fagg v. Chater,* 1997 WL 39146, at *2 (4th Cir. 1997); *Ferguson v. Commissioner of Social Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (citing *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001)).

In the instant case, Claimant has submitted discharge summaries for her two hospitalizations for psychiatric treatment. (ECF Nos. 12-1 and 12-2). Claimant was first admitted to St. Mary's behavioral health unit on May 3, 2011. (ECF No. 12-1 at 1). Dr. David Walker treated Claimant and recorded her mental health history. (*Id.*). Claimant reported that she had been treated for bipolar disorder and had a long history of depression. (*Id.*). Her most recent bout of depression lasted for one month, during which time she cried frequently, lost her appetite, and had difficulty sleeping. (*Id.*). Claimant stated that she currently experienced anhedonia, irritability, increased suicidal ideation, and decreased energy. (*Id.*). She indicated that Celexa had become less effective in treating her symptoms of depression. (*Id.*).  Further, Claimant reported that she worried excessively, causing her to avoid crowds and go shopping only late at night. (*Id.*). Claimant denied ever being psychotic and denied any compulsive traits. (*Id.*).

Following a physical examination, Dr. Walker diagnosed Claimant with

hypertension, GERD, migraines, and depression with suicidal ideation. (*Id.* at 2). The discharge summary included a description of Claimant's treatment during her hospitalization. (*Id.* at 3–4). Upon her admission, Claimant was placed on suicide precautions. During her treatment, Claimant was prescribed anti-depressants and anti-anxiety medication. (*Id.* at 3). Claimant participated in individual and group therapy sessions throughout her hospitalization. (*Id.* at 4). On May 11, 2001, Claimant was evaluated by Dr. Walker. (*Id.*). Claimant reported an improved mood and denied suicidal ideation or any hallucinations. (*Id.*). Dr. Walker noted that Claimant's thought processes were logical and that her behavior was calm. (*Id.*). Claimant's insight and judgment were considered good. (*Id.*). Claimant's sleep was stable and she denied suicidal ideation. (ECF No. 12-1 at 4). At discharge, Claimant was diagnosed with bipolar disorder, NOS; anxiety disorder, NOS; and borderline personality disorder. (*Id.* at 5).

On July 7, 2011, Claimant was readmitted to the behavioral health unit at St. Mary's complaining of depression with suicidal ideation. (ECF No. 12-2 at 1). Claimant reported that over the previous two months, she had continued to feel depressed regularly and had started to have thoughts of suicide. (*Id.*). Claimant stated that she was scared that she might walk in front of a semi-truck or "wreck herself on purpose." (*Id.*). Discussing her symptoms of depression, Claimant reported a loss of interest in activities, decreased energy, decreased appetite, difficulty sleeping, increased irritability, and increased feelings of isolation. (*Id.*). Claimant denied having panic attacks, obsessive compulsive traits, or periods of psychosis. (*Id.*).

Following her admission to the behavioral health unit, Claimant was prescribed a treatment regimen of anti-depressants, anti-anxiety medications, and individual and

group therapy. (*Id.* at 3). Claimant was also placed on suicide precautions. (ECF No. 12-2 at 3). On August 4, 2011, Claimant was evaluated by Dr. Walker. (*Id.* at 5). Dr. Walker observed that Claimant's mood was stable and that her behavior was calm. (*Id.*). Claimant's thought processes were logical and her judgment and insight were good. (*Id.*). Claimant denied suicidal ideation or having hallucinations. (*Id.*). Her sleep pattern was stable. (*Id.*). At discharge, Claimant was diagnosed with bipolar disorder, NOS; anxiety disorder, NOS; and nightmare disorder. (ECF No. 12-2 at 6).

Having reviewed the additional medical records, the Court concludes that they fail to satisfy the requirements necessary to warrant a remand under *Miller.* Claimant's first hospitalization and treatment at St. Mary's in May 2011 occurred during the pendency of the administrative proceedings at issue in this case. The ALJ's decision did not become the final decision of the Commissioner until June 13, 2011, more than one month after Claimant's discharge from St. Mary's. (Tr. at 1–5; ECF No. 12-1). Claimant makes no attempt to demonstrate a reasonable justification for her failure to acquire and submit this evidence to the Appeals Council and the Court cannot make a good cause argument on behalf of Claimant. Therefore, because Claimant bears the burden of showing that a remand is appropriate and has failed to make any effort to satisfy that burden, remand based upon the June 2011 admission is unwarranted. *See Fagg v. Chater,* 1997 WL 39146, at *2 (4th Cir. 1997); *Ferguson v. Commissioner of Social Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (citing *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001)).

Claimant's new evidence from her July 2011 hospitalization, while not in existence at the time of the Appeals Council's decision, still does not provide sufficient grounds for remand under *Miller*. In order to merit remand, the new evidence must be

relevant to a determination of disability at the time Claimant's SSI application was first filed. *Miller*, 64 Fed. App'x at 859: S*ee also Reichard v. Barnhart*, 285 F.Supp.2d 728 (S.D.W.Va. 2003) ("The new evidence must 'relate to the period on or before the date of the administrative law judge hearing decision.' 20 C.F.R. § 404.970(b). This does not mean that the evidence had to have existed during that period. Rather, evidence must be considered if it has any bearing upon whether the Claimant was disabled during the relevant period of time."). Here, the ALJ's decision was issued more than a year before Claimant's hospitalization, and the physicians who treated Claimant in July 2011 made no attempt to issue an *ex post* diagnosis of Claimant's impairments or functional limitations during the relevant time frame. Moreover, the psychological conditions attributed to Claimant generally do not persist without remission or fluctuation and do not progress on a steady and uninterrupted course.[9] Accordingly, Claimant's admission to a behavioral health unit in July 2011 is neither material to nor determinative of her condition prior to the ALJ's decision. Thus, while the 2011 records supplement Claimant's mental health treatment, nothing in these records bears on the central question that was before the ALJ: whether or not Claimant was disabled during the relevant time frame. Therefore, the Court finds that these records fail to satisfy the requirement that new evidence be relevant to the determination of disability.

Moreover, Claimant does not make a showing that the new evidence is material. Claimant offers no rationale to support the conclusion that the Commissioner's decision might reasonably have been different had the new evidence been before the ALJ. In fact, she curiously argues to the contrary. According to Claimant "the enclosed

---

[9] *See* Diagnostic and Statistical Manual of Mental Disorders, Fourth Addition (DSM-IV-TR), American Psychiatric Association, ©2000.

evidence from her recent hospitalizations demonstrate her bipolar disorder, anxiety disorder, nightmare disorder, borderline personality disorder, and migraine headaches[.]" (ECF No. 12 at 10). Nonetheless, Claimant proceeds to state that she "doubts that the Administrative Law Judge's decision would have been different in as much as he has blatantly disregarded the [Claimant's] treating physician's opinion and [Claimant's] allegations in general." (*Id.*). The records available to the ALJ in June 2010 establish that Claimant's psychiatric symptoms waxed and waned. She experienced acute symptoms during times of family stress or when she was having boyfriend problems. Otherwise, her mood was stable on medication. In order to qualify for benefits, Claimant must prove her "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A). Given Claimant's history and the periods of remission generally associated with Major Depressive Disorder, Bipolar Disorder, and Anxiety Disorder, it is, at best, speculative as to whether the new evidence would have altered the Commissioner's decision. The Commissioner's decision that Claimant's mental impairments were not disabling was based on the conservative nature of Claimant's mental health treatment, Claimant's own reports of her activities of daily living, the normal results repeatedly found on examination and diagnostic testing, the clinical notes of Claimant's psychiatrist and psychotherapist, and the findings of three state agency mental health experts. The new evidence submitted by Claimant includes no analysis of Claimant's functional limitations or her expected prognosis with treatment. In light of the substantial evidence supporting the Commissioner's decision and the absence in the 2011 records of a function-by-function assessment of Claimant's ability to perform basic work-

related activities, the Court concludes that Claimant has not carried her burden to establish that the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the evidence been before him. Therefore, because Claimant has failed to carry her burden on the relevancy and materiality of the new evidence, remand is not warranted. As the Commissioner suggests, Claimant is free to file a new application for benefits and argue that her 2011 treatment records demonstrate a significant deterioration of her mental condition that now renders her disabled and qualifies her for benefits.

**VII.    Conclusion**

   After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

   The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

   **ENTERED**: August 1, 2012.

Cheryl A. Eifert
United States Magistrate Judge